cause of action alleged, and the plaintiffs' motion was properly denied.    But, even if granted, it would not have helped the plaintiffs, for the reason that there was a failure to prove any loss or damage by reason of the delay.    We think, therefore, where, as here, the plaintiffs directly selected the ground upon which they based their right to recover, and endeavored to fortify this by inducing the consignees to write a letter which cannot be said to reflect credit on any of the parties, that, after it was found that such a theory would not prevail, the court was justified in disallowing an amendment which would have introduced a different cause of action, and which, as we have said, upon the evidence, even if allowed, would not have saved the plaintiffs' case.

We think that the direction in the defendant's favor was right, and that the exceptions should be overruled, and judgment directed for the defendant upon the verdict, with costs.    All concur.

---

(3 App. Div. 563.)

ROOSEVELT v. LAND & RIVER IMP. CO. et al.

(Supreme Court, Appellate Division, First Department. April 10, 1896.)

1. TRUSTS—INVESTING TRUST FUND IN INDIVIDUAL NAME OF TRUSTEE.

Where one of two trustees has funds of the trust estate in his possession, and, with the consent of his co-trustee, invests them in mortgages taken in his own name, such mortgages, as between the trustee making the investment and the trust estate, are the property of the latter.  33 N. Y. Supp. 536, affirmed.

2. SAME—REMEDY AGAINST THIRD PARTIES.

Where a trustee assigns securities taken in his own name, but purchased with trust funds, as collateral security for a loan procured by him for a corporation of which he is an officer, and the assignee has no notice of the trust, the corporation, in an action in equity to which all the interested persons are parties, will be compelled to pay the amount for which the securities are pledged and release the pledgee's lien.  33 N. Y. Supp. 536, affirmed.

Appeal from special term, New York county.

Action by James Roosevelt, as trustee of the estate of William Edgar Howland, deceased, against the Land & River Improvement Company, and others, to recover possession of bonds and mortgages as part of the estate of plaintiff's testator.   From the decree (33 N. Y. Supp. 536), the defendant land company appeals.   Defendant James B. Williams asks a modification of the decree as to him.   Modified and affirmed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, and O'BRIEN, JJ.

Alfred Jaretzki, for appellant.
Jas. R. Soley, for respondent Roosevelt.
Chas. E. Miller, for respondent Williams.

PATTERSON, J.   In the subject-matter of this action are involved the ownership of and claims upon a fund paid into court, being the amount due on three mortgages on real estate in the city of New York, which were made by Max Danziger, as mortgagor,

to Francis H. Weeks, as mortgagee. When the suit was instituted the mortgages were still outstanding liens, and Mr. Danziger was made a defendant; but on his application they were paid off, the money placed in a court depository to await the determination of the suit, and Mr. Danziger was allowed to retire from the litigation. The case has been much simplified since the hearing and decision at special term. There, the court was called upon to ascertain, adjust, and administer the rights and equities of many parties who claimed the mortgages or some one or more of them. The plaintiff, as executor of and trustee under the will of William E. Howland, claimed them all, as the equitable owner thereof. Other parties claimed in the right of estates of which they were the trustees or representatives. The defendant Williams claimed to hold them by assignment from Weeks, for value, and without notice of the claims or equities of any third party; and his claim has been recognized and sustained by the decree as paramount to all others. The Land & River Improvement Company is brought in as a party defendant, because of its relation to the mortgages, growing out of a transaction presently to be mentioned. All the defendants, claimants, except the land company and Williams, have disappeared from the suit as it comes before us, by failing to appeal from the decree; and the contest is now narrowed down to one between the plaintiff, the Land & River Improvement Company (the appellant), and Mr. Williams, who has not appealed, but who urges that the full and proper relief to which he was entitled was not awarded him, and that, hence, a modification of the decree must be made in his behalf. We will therefore confine our consideration of the case to the material matters involved, as affecting the rights of the parties now before us, except so far as incidental reference may be necessary to other matters not immediately concerning such parties.

Prior to October, 1885, Francis H. Weeks, a lawyer in the city of New York, was the adviser, attorney, and agent of many clients, who reposed in him unbounded confidence. He was the trustee of estates, the attorney in fact as well as at law of many persons, and the custodian of their money securities. Among those to whom he stood in the latter relation was Mr. W. E. Howland, who resided in France. Mr. Howland died in February, 1885, and by his last will and testament appointed Weeks and the plaintiff executors thereof, and trustees of a trust for the benefit of his (the testator's) widow. Weeks and the plaintiff, Roosevelt, qualified as executors, and entered upon the duties of their trusteeship. Weeks had in his possession, at the time of Mr. Howland's death, and in October, 1885, shares of stock of a railroad corporation and certain consolidated stock issued by the city of New York. In October, 1885, those stocks belonged to the trust of the Howland estate. It was about that time agreed between Mr. Roosevelt and Weeks that the investment of the amounts then represented by the stocks referred to, should be changed, for which purpose they were sold by Weeks, and the proceeds, amounting to something over $74,000, were deposited by him, to the credit of his personal account, in the National Bank of Commerce of the City of New York. That was done on the 22d

day of October, 1885. Before the sale of the stocks was made, the nature of the security in which the proceeds of sale were to be invested was agreed upon. Bonds and mortgages were the selected securities, and it was agreed that loans of $60,000 should be made to Max Danziger, to be secured by mortgages upon four pieces of real estate belonging to him, each piece to be separately mortgaged for $15,000. Roosevelt examined the premises to be covered by the mortgages, and assented to the loans being made upon them. All this was done, of course, before the mortgages were made. Some of the money was not actually advanced until a month after the bonds and mortgages were delivered. Thus we have, to start with, in the investigation, the facts that in October, 1885, the Howland trustees resolved to make the investment in the Danziger mortgages, and, further, that they sold securities of their trust to provide the money to advance to Danziger, and that, in their inception, those mortgages were connected exclusively with a transaction in which the trustees of the Howland estate were alone concerned, on the one side, as investors of money of that estate. Weeks attended to the arrangement of the details of the loans, and, instead of having the mortgages drawn to Mr. Roosevelt and himself as trustees, he procured them to be made out in his own name as mortgagee. This fact 'he concealed from Roosevelt, who did not become aware of it until some time in 1893, when Weeks became a fugitive from justice, and was brought back from foreign parts to be tried on an indictment for felony. Meantime, from 1885 until 1893, Weeks perpetrated a series of fraudulent acts in connection with these mortgages and the bonds to which they were collateral, using them from time to time for his own purposes, but never parting with the legal title to but one of them, which he assigned, by formal instrument, in 1888, to a Mr. Stevenson, and thus removed it beyond the reach of the true owner. He stated to the beneficiaries of different trusts that the mortgages were securities of the particular estates in which those persons were interested, and in all his juggling with these securities he always eluded detection, and retained the confidence of those whose interests he had in charge, until late in April, 1893, when, upon his absconding, his long-continued nefarious deeds came to light. We are now concerned with the ramifications of but one of Weeks' fraudulent transactions,—that one which brought into business relations the trustees of the Howland trust (Weeks was displaced in the summer of 1893 by order of the court) and the defendant Williams and the land company. Weeks was the president, treasurer, and active executive officer of that company. Some time previous to December 12, 1892, he represented to Williams that the company was in need of funds, and he made application to Williams for a loan. By an arrangement made between Weeks, as the representative of the company, and Mr. Baxter, one of its directors, and Williams, the latter loaned to the land company certain bonds of railway companies belonging to him (Williams) individually, to be used as collateral to enable the land company to borrow elsewhere the sum of $30,000, and it was also agreed that the three Danziger mortgages should be assigned to Williams, to hold as security

for the return of his railway bonds.    The transaction was evidenced
by a writing delivered to Williams as follows, viz.:

"December 12, 1892.

"Received from James B. Williams, as a loan, thirty thousand dollars of the
consolidated five per cent. mortgage bonds of the Northern Pacific R. R. Co.
Nos. 18,707 to 18,733, inclusive, and 18,735 to 18,737, inclusive; and also eighteen
thousand dollars Northern Pacific & Montana R. R. Co. first-mortgage bonds
Nos. 4,967 to 4,974, inclusive, and 4,978 to 4,989, inclusive.  Said bonds to be
returned to said Williams within ninety days from date, and as collateral se-
curity for said loan three bonds and mortgages for fifteen thousand dollars
each, made by Max Danziger to Francis H. Weeks, all dated November 2,
1885, have been assigned by said Francis H. Weeks to said Williams.

"[L. S.]        Land & River Improvement Co., by F. H. Weeks, Presd't."

This agreement tells the whole story of the transaction of which
it is the evidence, and shows, without the need of construction, what
each party did, and what relations were constituted between them.
No question can be raised of Weeks' authority to borrow the secu-
rities, nor of the loan being made directly to the company.    The
Williams bonds were in terms borrowed by the company, and, as
the instrument shows, the company pledged the mortgages to Wil-
liams; for, although to be assigned by Weeks to Williams, that was
to be done to make them available as a pledge for the obligation of
the company, and not for a private indebtedness of Weeks in any
manner.    The land company, not constructively, but actually, used
the mortgages for its own purposes, and received the benefit of them.
They were in due form assigned by Weeks to Williams, who took
them without knowledge or notice of Weeks' true relation to them;
and, as an innocent holder, they are not impressed with a trust in
his hands, whereby his lien or claim upon them could be affected.
Williams' securities were never returned to him, nor has he ever
been satisfied, in whole or in part, for their value.    Weeks' sub-
sequent dealings with Williams' securities were in some respects as
dishonest as most of his conduct.  He took them to the Bank of
Commerce and borrowed $30,000 on them, giving to the bank his
individual note for that amount.  He also borrowed $10,000 from a
Mr. Oakes, which he added to the $30,000 obtained from the bank.
He deposited the $40,000 thus raised to the credit of the defendant
land company in its bank account.    Thus this money is followed into
the land company's possession.  But Williams did not know that
Weeks borrowed it on his personal note, nor is there anything in
the evidence to justify an inference that he had any information or
notice that Weeks, at any time, was using these securities for any
other purpose than the particular one for which they were originally
loaned.    The subsequent history of this transaction with the bank is
important.  Weeks' note for $30,000 was at 90 days, and fell due
March 13, 1893.  Thirty days before that due date, Weeks, as treas-
urer of the land company, drew a check for $40,400 to his own or-
der, individually, but entered on the check-book stub or counterfoil
that it was drawn to pay the bank its $30,000 and Oakes his $10,000
and interest on both sums.  That this was a mere deception and
concealment of an abstraction of money seems undeniable.    The
bank's note had still a month to run, and it was not paid.  On the

contrary, when it matured, $5,000 was paid on account, and the balance renewed for 30 days; the securities still continuing in pledge to the bank, and Weeks made them the basis of another transaction at a later date with the bank. What has thus far been said is sufficient to indicate upon what facts the rights of the three parties now before the court were adjudicated, and upon them the learned justice at special term held that the plaintiff, as trustee, was the owner, in equity, of the three bonds and mortgages described in the complaint; that he was entitled to receive them (or their proceeds paid into court), subject to the right of the defendant Williams to them (or to the fund), as collateral security for the return by the defendant land company of his securities loaned by him for the benefit of that company; that there should be judgment directing the land company to pay to Williams the value of such bonds on the 13th day of March, 1893, to wit, the sum of $36,803.50, with interest thereon to the date of such payment; that Williams have judgment against the land company for that amount; and that, upon the payment of that amount to Williams, the plaintiff was entitled to the fund in court. Thus the rights and equities of the parties were finally disposed of, except that one matter was left open, to which reference will be made hereafter.

On this appeal, the first question raised was as to the plaintiff's ownership, in equity, as trustee of. the Howland trust, of the three mortgages. It was incumbent upon the plaintiff to establish, as against all the defendants on the record, that the bonds and mortgages were actually the product of the Howland moneys, or, in other words, that those moneys be traced directly into such mortgages. There is no dispute concerning the rule in equity by which trust moneys are followed through a trustee's mixed account under circumstances such as are disclosed here. That rule, which is generally referred to as the rule in Hallett's Case (Knatchbull v. Hallett, 13 Ch. Div. 696), was announced, in substance, in Baker v. Bank, 100 N. Y. 31, 2 N. E. 452, and distinctly in Bank v. Peters, 123 N. Y. 272, 25 N. E. 319. In the case at bar, the money of the Howland trust was satisfactorily traced into the bank account of Weeks with the Bank of Commerce, and out of that account into the Danziger mortgages. The defendant land company is compelled to admit that, by the 6th of November, 1892, there had been paid to Danziger, on his mortgages, out of the Howland. money, at least the sum of $31,931.51. An analysis of the testimony on this subject shows that $60,000 of the Howland money (within a small fraction) went into these mortgages. The $31,931.51 paid before November 6th is conceded. The subsequent payments to Danziger, or for him, extended over a period from November 12th to December 19th. The dissection of Weeks' bank account made by Mr. Kenworthy, the expert accountant, shows that, of the $60,000, all (but a few hundred dollars, possibly) went into the mortgages. The separation of the personal funds and moneys specifically drawn out for other purposes than to pay to Danziger seems to be complete, and we think the court below was right in so finding. For all money of other persons that may have gone into Weeks' account he seems

to have accounted to the owners, and the court below was justified in treating those moneys in the same way that it did the personal funds of Weeks.  Baker v. Bank, 100 N. Y. 31, 2 N. E. 452.

Our conclusion on this branch of the case may be summed up thus: The right of the plaintiff is based upon tracing the trust moneys into the mortgages at the outset, and not upon any theory of the substitution of the mortgages subsequently for the money.  Those mortgages constituted an investment originally contemplated by Roosevelt and Weeks, to make which railroad and municipal bonds of their trust estate were sold, and the moneys realized put into Weeks' bank account, to be in readiness for that identical investment; and, upon an analysis of that account, applying the recognized rule of the application of drawings, the evidence shows that the $60,000 of mortgages were paid for by the Howland moneys.  Thus we ascertain that the Howland trustee is the equitable owner of these mortgages.

The second question relates to the rights of the defendant Williams and the obligations of the land company.  Williams has the legal title to the three mortgages, as the assignee thereof, for value, without knowledge or notice of latent equities.  He is in no way affected by any transactions of Weeks with the land company after he parted with the possession of his railroad bonds to the company. He is entitled to stand on his written agreement, and if Weeks' fraudulent acts as an officer of the land company have entailed loss upon that company, it is one for which Mr. Williams is in no way responsible.  It is suggested by the learned counsel for the appellant that, when Weeks took up the $30,000 note, the indebtedness of the land company was paid, and any subsequent dealings of Weeks with the bank were on his own account.  The inference sought to be drawn from that seems to be that, by the act of Weeks in retiring that note, the land company became discharged from the transaction, and it was then left as a matter between Williams and Weeks individually.  It is said that Weeks drew his check for $30,000, and paid the note, and then made a new transaction with the bank, borrowing $25,000, and repledging the same securities, and that Williams was told of the reduction of the indebtedness.  Whatever form the transaction assumed, it was, in fact, only a renewal of the loan by the bank to the extent of five-sixths of the first loan.  It is claimed that, what may be considered as the proceeds of the mortgages, realized in the way stated, having, by the repayment of the loan, found their way back into Weeks' hands as an individual, the land company is not responsible for what Weeks did afterwards, and that the transaction, so far as the company is concerned, ended. But that is not the situation.  The $30,000 note was only paid in part.  The rest of it was renewed.  It was not an entirely new loan to Weeks.  But, suppose it was; it then became the business and the duty of the land company to see that Williams' securities were returned to him.  Whether it may be said that the company converted the Williams securities is immaterial.  It failed to return them.  On the payment of the note he was entitled to them; but there was nothing but a partial payment, and the securities were

not released so that they might be returned. It was a transaction never closed between the land company and Williams. It remains open to this day, and the status of Williams has not been changed. He demanded the return of his bonds from Weeks, who, as said, was the financial officer of the company, and the proper person to demand them from. There are no equities of the land company overriding those of Williams, nor is there an equality of equities; and he cannot be turned from his direct course in the pursuit of his rights by the effort to raise an issue based upon supposititious relations between him and Weeks individually. So far, then, as the rights and relations of the parties now before the court are concerned, we think they were equitably and justly ascertained and defined by the justice at special term; and, the parties being all before the court, and it being in full possession of the subject-matter of the action, plenary relief can be afforded by final decree. This was sought to be done by the provisions before referred to, but we think those provisions do not settle, as absolutely and thoroughly as should be, Mr. Williams' rights. The modification he asks for should be made, without compelling him to apply for further relief at the foot of the decree, and thus leave open for further discussion the matter of what additional relief he may be entitled to. He has undoubtedly the first right, to the extent found by the court below. There is no reason why he should be indefinitely postponed in realizing the amount due him. His priority of lien entitles him to priority of payment, and therefore the decree should be reformed to this extent, viz. that a provision be added that Williams have execution against the land company for the amount directed to be paid by it to him, and that, if such payment is not made, or Williams fails to collect the amount on execution, then he may apply to the court, on notice, to be paid out of the fund in the court depository, and shall be entitled to such payment, on assigning to the plaintiff all his rights under this decree, in manner and form to be approved by the court.

With this modification, the judgment appealed from must be affirmed, with costs. All concur.